FILED
IN CLERKS OFFICE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

2005 DEC 27 P 2: 43

Case No.: 1:05-CV-11486 MLW

U.S. DISTRICT COURT.
DISTRICT OF MASS.

LAWRENCE SHUTZER,
PLAINTIFF

V.

S. ROTHSCHILD & CO., INC. ET AL.

### Affidavit of Lawrence Shutzer
### In Support of Plaintiff's Opposition to Defendants'
### Motion to Dismiss and/or Transfer Venue

Lawrence Shutzer deposes and says as follows:

1.      I am the Plaintiff in the above-entitled action and reside in Swampscott, MA and have an office in Marblehead, MA.

2.      The facts stated in this Affidavit are my own personal knowledge.

3.      I incorporate herein by reference paragraphs 9-22, inclusive, set forth in the Complaint filed in this action, and I re-affirm the factual allegations set forth therein.

4.      In addition to the Complaint's recitation of facts, the following facts are alleged in opposition to the Defendants' Motion to Dismiss and/or Transfer Venue. Not only was I personally, on RMC's payroll, my office in Marblehead, Massachusetts was the executive office for ("RMC"). In addition to myself, there were three employees of RMC who worked out of, or reported to, RMC's Marblehead office, two salesmen and an administrative assistant. I was the executive manager of the company and all decisions regarding sales, design, pricing, arranging for manufacturer (sourcing) and quality control

emanated from the Marblehead office. Customer complaints and concerns were also handled in Marblehead. In furtherance of the transaction between the parties, two draft agreements were drawn up by the attorneys. The first was a draft Asset Purchase Agreement and the second was an Employment Agreement between myself and a new entity to be formed. From approximately March through November, 2000, I repeatedly requested that Mr. Friedman execute the documents. His repeated response was: "What are you worried about?" "You're being paid". Let's get the business going, and we'll worry about signing documents later."

5.      I should note that there were only two or three face-to-face meetings in New York with Mr. Friedman; one with me (and my counsel) and Mr. Friedman (and his counsel) and one or two where just Mr. Friedman and I discussed the deal. The meetings between Mr. Friedman and myself were not formal discussions of our deal, but occurred while we were discussing ongoing company business. The transaction only came up at other times when I brought up that I was hoping to have the contracts signed. As above stated Mr. Friedman continued to just put me off. The major negotiations took place during several telephone conference calls with my counsel and me in Massachusetts and Mr. Friedman and his counsel, in New York. In addition, there were communications directly between my Massachusetts counsel and Mr. Friedman and his New York counsel, both on the telephone and in writing. Despite the failure to obtain signed contracts, I continued to write business for RMC (ultimately approximately 19 million dollars.)   In December, 2000 Mr. Friedman asked me to go to the Far East to deal with a client matter. I told him that I wanted the contracts to be signed before I went. He said they would be signed, when I got back, and that he had no problems with

2

the Contracts per se. I told him that I insisted that the contracts be signed before I went. He was adamant. I was adamant, and I did not go. Further negotiations continued through our respective counsel through approximately April or May of 2001.

6.    RMC continued to make profits and benefit from the sales made by me and my staff, through 2001, and possibly as late as into 2002. Throughout my employment by RMC, I fully performed pursuant to our agreement. I transferred the New York showroom, I transferred approximately $10 million in Mimco orders to RMC and sold approximately $9 million in additional orders. I duly performed my duties as an employee. It was Mr. Friedman, acting as the principal of the corporate Defendants, who continued to stall finalizing the paperwork and ultimately refused to pay me what was due me for my efforts pursuant to our deal and for certain assets retained by the Defendants. Indeed, on August 21, 2000, Friedman sent to me the attached note (Exhibit "A") relative to payment of commissions in the Mimco accounts I have never been paid the remainder. By early 2001, I was becoming increasingly aware that Mr. Friedman believed that his companies could retain on a going-forward basis a great deal of the accounts which I had brought to RMC, and that by letting me go he would not have to pay me what he had agreed he would pay me.

7.    It is not simply true, as Defendants' allege, that the locus of the dispute is solely in New York. It is not true, that all negotiations took place in New York. As above stated, RMC established its executive offices in Massachusetts which existed throughout the year 2000. Three employees worked full-time out of that office. All three are witnesses and could be called, as will my Massachusetts lawyer, Paul Levenson, who handled the negotiations on my part. The sales records for the period in question are in

3

Massachusetts. All quotes to customers of RMC originated from Marblehead,
Massachusetts. Customer orders were received in Marblehead, Massachusetts. Quality
control was conducted from Marblehead as, were complaints from customers. Further,
the Defendants maintained a warehouse in Fall River, Massachusetts to which
manufactured goods for RMC were shipped from manufacturers and then transshipped to
customers to fill the orders I had written. I personally visited the warehouse on multiple
occasions and dealt with the SRC supervisor of the warehouse relative to customer
orders. What was handled in New York was the financing of orders, (letters of credit,
etc.), billing, payment, and distribution issues. In addition, there was an RMC showroom
in New York (Mimco's former New York showroom which was assigned to RMC)
where some sales were made. However, the showroom and its staff were directly
supervised by me from Marblehead. RMC and/or SRC paid the expenses for the
Marblehead office. Accordingly, I submit that Massachusetts has as much, if not more
of a nexus to the current dispute than New York.

8.      Finally, a word as to why I waited until 2005 to file the lawsuit. SRC, and Mimco
were defendants in a suit brought by Alexander Julian, Inc., in the New York State Courts
alleging that Mimco fraudulently conveyed its assets to SRC. The Plaintiff in that case
did not prevail. However, appeals in that suit were not finally disposed of until 2005. If I
had sued SRC while the other case was pending, it may well have had a deleterious effect
with respect to the Julian litigation both for Mimco and for the Defendants. As above
stated, Mimco's claims against, the Defendants in the instant action have been assigned
in writing to me.

Subscribed under the penalties of perjury this 27 day of December, 2005.

_____
Lawrence Shutzer

CERTIFICATE OF SERVICE

THE UNDERSIGNED HEREBY CERTIFIES THAT THE
FOREGOING PLEADING HAS BEEN SERVED ON ALL
COUNSEL OF RECORD BY FAX / FIRST CLASS MAIL / HAND DELIVERY
THIS 27 DAY OF DECEMBER, 2005.

_____
LAWRENCE M. SLATER, ESQ.
BBO 648830

S. Rothschild & Co., Inc.
500 7th Avenue
6th floor
New York, New York 10018

August 31, 2000

Lawrence Shutzer
46 Tioga Way
Marblehead, MA 01945

Dear Larry:

In consideration of your delivery to S. Rothschild & Co., Inc., of purchase orders for Wal-Mart in the amount of $10,000,000.00, we agreed to pay you a one time commission of $175,000, which represents 1.75% of the amount of the purchase orders.

Accordingly, I enclose herein a check in the amount of $116,000.00 which represents a partial payment of that commission.

Sincerely,

Mark Friedman
President